# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| ERGO LICENSING LLP, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Docket no. 2:08-cv-259-GZS |
| | ) |
| CAREFUSION 303, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |
| | ) |
| CAREFUSION 303, INC., | ) |
| | ) |
| Counterclaimant, | ) |
| | ) |
| v. | ) |
| | ) |
| ERGO LICENSING LLP, | ) |
| | ) |
| Counterdefendant. | ) |
| _____ | ) |

## ORDER ON CLAIMS CONSTRUCTION

Defendant CareFusion 303, Inc. ("Defendant" or "Carefusion") manufactures and sells infusion systems, which are medical devices used to deliver intravenous fluids to patients in controlled amounts. Plaintiffs Ergo Licensing, LLC and Dr. Uvo Holscher (together, "Plaintiffs" or "Ergo") claim that Carefusion's infusion systems infringe on United States Patent No. 5,507,412 ("the '412 Patent").

As a result of various agreements by the parties, the Court currently has before it the following terms for construction: (1) "set" (Claims 1 & 18), (2) "adjusting means" (Claims 1 & 18), (3) "programmable control means/control means" (Claims 1 & 18), (4) "data input means"

1

(Claim 1 & 18), and (5) "flow measuring means" (Claim 10). (See Aug. 3, 2010 Order Setting Hearing (Docket # 184) & Stipulation Regarding Claims (Docket # 196).)

The parties each filed an opening claims construction brief (Docket #s 137 & 139). Each side also filed a responsive claims construction brief. (Docket #s 151 & 153). The Court held a Markman hearing on October 4, 2010.

**I.    The Claims**

The '412 Patent contains twenty claims only three of which are explicitly at issue for purposes of the pending claims construction. The Court begins by laying out those three claims with each instance of the disputed terms highlighted :

**Claim 1**

Multichannel metering system for metering preselected fluid flows comprising:
a plurality individual fluid flow sources;
a plurality of discharge lines, each line of said discharge lines being connected to a corresponding one of said fluid sources;
**adjusting means** associated with said fluid flow sources for acting on said fluid flow sources to influence fluid flow of said fluid flow sources;
**programmable control means** coupled with **adjusting means** for controlling said **adjusting means**, said **programmable control means** having data fields describing metering properties of individual fluid flows;
an operating surface connected to said control means;
**data input means** for input of data into said control means, said **data input means** being at least partially connected to said operating surface;
data output means for output of data from said control means, said data output means being connected to said operating surface;
selector switch means forming a part of said **data input means**, said selector switch means including a plurality of selector switches, each selector switch being associated with a **set** of fluid flow sources for representing segments of data fields belonging to a corresponding **set** of fluid flow sources on said operating surface, said each selector switch functionally connecting said **data input means** with said data fields belonging to said associated **set** of fluid flow sources.

**Claim 10**

Metering system according to claim 1, further compromising **flow-measuring means** for determining fluid flow being metered into said discharge lines, said **flow measuring means** being in functional connection with said programmable control means.

**Claim 18**

Multichannel metering system for metering preselected fluid flows, comprising: a plurality of individual fluid flow sources divided into a plurality of **sets**; a plurality of discharge lines, each line of said discharge lines being connected to a corresponding one of said fluid flow sources;
- **adjusting means** associated with said fluid flow sources for acting on said fluid flow sources to influence fluid flow of said fluid flow sources;
- **control means** coupled with said **adjusting means** for controlling said adjusting means, said **control means** having data fields describing said fluid flow sources and metering parameters of said individual fluid flows, said **control means** including a meter management mode for editing and regulating metering parameters;
- an operating surface connected to said operating means;
- **data input means** for input of data into said **control means**, said **data input means** being at least partially connected to said operating surface;
- data output means for output of data from said **control means**, said data output means being connected to said operating surface;
- a plurality of selector switch means, each of said selector switch means being associated with one of said plurality of **sets** of said fluid flow sources, said each selector switch means placing said **control means** in said meter management mode for said associated **set** of fluid flow sources.

('412 Patent at 8:19-10:47 (emphasis added).)

## II. DISCUSSION

### A. "Set"/"Sets"

The term "set" appears multiple times in Claim 1 and Claim 18 (where the term appears in singular and plural form). In both of these independent claims, the term "set" appears as part of the phrase "set of fluid flow sources." Ergo contends that in this context "set" means "one or more." Carefusion contends that set means "collection" or "two or more." In short, this

3

Court is asked to determine whether the term "set" can ever mean just one in the context of the '412 Patent. More specifically, whether a "set of fluid flow sources," as used in Claims 1 and 18, encompasses just one fluid flow source.

The Court begins its construction by considering the "ordinary and customary" meaning of "set" to a "person of ordinary skill in the art in question at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313. At oral argument, Carefusion advocated for the ordinary and customary construction of "set" in part by arguing that ordinary references to a set of towels, a set of golf clubs or a set of keys would not be construed to mean a single towel, a single club or a single key. Absent any suggestion that a person of ordinary skill in the art[1] would subscribe to a different specialized definition of "set," these examples undoubtedly establish that "set" ordinarily refers to a collection, that is, two or more, when it precedes and describes a plural noun. Thus, a person of skill in the art would construe the plain use of "set" in Claims 1 and 18 to mean "two or more."

However, the Court's inquiry does not end here. For, the customary "two or more" construction becomes problematic once a person skilled in the art considers dependent Claims 16 and 19. Dependent Claim 16 reads, in relevant part:

> A system in accordance with claim 1, wherein: said **set** associated with said each selector switch contains only one of said fluid flow sources.

('412 Patent at 9:41-43 (emphasis added).) Claim 19 reads in relevant part:

---

[1] Ergo has indicated that a person of skill in the art of the '412 Patent would be either a biomedical or biomechanical engineer and/or an ergonomist.

> A system in accordance with claim 18, wherein: each of said associated **sets** of fluid flow sources contain only one fluid flow.

('412 Patent at 10:49-51 (emphasis added).) In short, Claims 16 and 19 explicitly contemplate sets that contain "only one" fluid flow source. Thus, these dependent claims suggest that the patentees of the '412 Patent acted as their own lexicographers using the term "set" to encompass both the customary definition of "two or more" as well as "only one." See CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[T]he claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.")

Notably, these dependent claims were added to the '412 Patent after the initial patent application was rejected. In the initial application, the term "set" was not used at all. Rather, Original Claim 1 claimed that "a selector switch [was to be] associated with each individual fluid flow source or associated with predetermined groups of said fluid flow sources." (ERGO004837 (Docket # 140-1).[2]) The examiner rejected Original Claim 1 explaining that the use of "or" "renders the claim indefinite" and that the use of "predetermined groups of said fluid flow sources" "lack[ed] proper antecedent basis." (ERGO004963.) In response, Claim 1 was amended to its current form, including the term "set" and adding Claims 16 and 19.[3]

In addition to the support for the "one or more" construction found in dependent claims and the prosecution history, the specification and figures offer further evidence for the "one or more" construction. See DSW, Inc. v. Shoe Pavilion, Inc., 537 F.3d 1342, 1347 (Fed. Cir. 2008)

---

[2] For ease of reference, the Court's citation to the Prosecution History uses the bates number.

[3] Carefusion has argued these amendments were made to overcome prior art that disclosed an association of a selector switch with a single fluid flow source. The Court, having reviewed the prosecution history, including the entirety of the August 29, 1995 Amendment filing, finds no support for that argument. (See ERGO005266-79.) Moreover, if the "set"-related amendments were an attempt to overcome prior art, one would have anticipated amendments to the figures and specification that similarly made clear the patentee was disclaiming the "one-to-one" configuration. As is described herein, the specifications and figures were not amended and still reflect both a "one-to-one" configuration and a "one-to-many" configuration.

(citing Northern Telecom Ltd. v. Samsung Elecs. Co., 215 F.3d 1281, 1295 (Fed.Cir.2000)) (noting that "contravening evidence from the specification or prosecution history" may overcome the otherwise "plain and unambiguous claim language"). At the outset, the specification refers to selector switches beings associated with individual fluid flow sources "and/or" groups of fluid flow sources:

> This object [of improving a multichannel metering system] is attained in that individual fluid flow sources and/or predetermined groups of fluid flow sources are associated with selector switches . . .

('412 Patent at 2:14-16.) In relevant part, the specification later explains:

> The manner of association of the selector switches either to individual fluid flow sources or to individual groups of fluid flow sources is determined by the total number of fluid flow sources connected to the metering system. If up to circa six fluid flow sources are present, one selector switch is associated, in general, with each fluid flow source, and a division into groups is performed above this limit, and the upper limit is approximately six fluid flow sources in each group.

('412 Patent at 2:32-41.)[4]

As these portions of the specification make clear, the '412 Patent contemplates a "one-to-one" configuration between the fluid flow sources and the selector switches so long as there are no more than six fluid flow sources. With more than six fluid flow sources, the specification contemplates that the fluid flow sources would be divided into groups thereby allowing one selector switch to be connected to two or more fluid flow sources. At oral argument and in various filings, the parties have described this as the "one-to-many" configuration. Carefusion's proposed "two or more" construction of "set," which would cover only a "one-to-many" configuration, simply cannot be reconciled with these quoted portions of the specification. See Laryngeal Mask Co. Ltd. v. Ambu, 618 F.3d 1367, 1371 (Fed. Cir. 2010) (explaining that "the specification is the single best guide to the meaning of a disputed term"). Likewise, the figures

---

[4] Notably the just-quoted paragraph of the specification was included in the initial filing (See ERGO004821.)

of the patent display both the "one-to-one" configuration and the "one-to-many" configuration. Specifically, Figure 1 shows a single fluid flow "set" connected to a selector switch. But, Figure 4 shows a "set" with multiple fluid flows connected to a single selector switch.[5]

Having considered all of the intrinsic evidence, including the related dependent claims, the prosecution history, the specification and the figures, the Court concludes that "set" as used in Claims 1 and 18 encompasses one or more fluid flow sources. This conclusion undoubtedly expands the "ordinary and customary" meaning of "set." However, due consideration of all of the intrinsic evidence makes clear that the patentees acted as their own lexicographers to overcome an initial rejection based on indefiniteness. See, e.g., Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1381 (Fed. Cir. 2008) ("A patentee may act as its own lexicographer and assign to a term a unique definition that is different from its ordinary and customary meaning; however, a patentee must clearly express that intent in the written description.") In doing so, they revised the patent to make clear that a "set" of fluid flow sources might, in some instances, contain "only one" fluid flow source while also being able to accommodate "two or more" fluid flow sources.

### B. The "Means Plus Function" Terms

The parties agree that the remaining four terms to be constructed are "means-plus-function" claims subject to 35 U.S.C. § 112, paragraph 6. (See Stipulation Regarding Claims (Docket # 196).) "In construing a means-plus-function claim, the district court must first determine the claimed function and then identify the corresponding structure in the written

---

[5] The Preferred Embodiment section of the '412 Patent describes these sets as "groups" and notes that sets "can either be structured according to physiological action of the drugs to be metered, or organ-specific groups are formed, so that rapid access to a defined fluid flow sources is possible due to the prestructured groups in the case of a change in parameters." ('412 Patent 7:50-55.)

description of the patent that performs that function." Baran v. Med. Device Techs., Inc., 616 F.3d 1309, 1316 (Fed. Cir. 2010) (citing Applied Med. Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1332 (Fed. Cir. 2006)). As the Federal Circuit has repeatedly explained:

> Section 112, paragraph 6 was intended to allow the use of means expressions in patent claims without requiring the patentee to recite in the claims all possible structures that could be used as means in the claimed apparatus. However, '[t]he price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof.'

Medical Instrumentation & Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1211 (Fed. Cir. 2003) (quoting O.I. Corp. v. Tekmar Co., 115 F.3d 1576, 1583 (Fed. Cir. 1997).) "Whether the written description adequately sets forth the structure corresponding to the claimed function must be considered from the perspective of a person skilled in the art." Telcordia Techs., Inc. v. Cisco Sys., 612 F.3d 1365, 1376 (Fed. Cir. 2010) (citing Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357, 1365-66 (Fed. Cir. 2003)). Ultimately, if no corresponding structure is disclosed in the specification, the claim term must be construed as indefinite. See Biomedino, LLC v. Waters Techs. Corp., 490 F.3d 946, 950 (Fed. Cir. 2007) ("If there is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite.").

### 1. "Adjusting Means"

Both sides agree that the function of the "adjusting means" is to "act[] on said fluid flow sources to influence fluid flow." ('412 Patent at 8:27-28.) Ergo contends the structure for this function is simply "motor drives" (and equivalents thereof). Carefusion asserts the structure is more limited to either "a self-locking motor drive with a clutch" or a "non-self-locking [motor] drive with a brake" (and equivalents thereof).

8

The term "motor drive" appears a total of eight times in the specification of the '412 Patent. When all of the "motor drive" references in the specification are considered, it is clear that the reference to "self-locking motor drive with clutch" and "non-self-locking [motor] drive with brake" are simply examples of the types of motor drives that might be used as adjusting means. In two other places, the specification states the adjusting means is simply "a motor drive actuating the plunger of the syringe." ('412 Patent at 3:2-3; 3:62-63.) Given this more general use of "motor drive," the corresponding structure appears to cover any motor drive that would actuate the plunger of the syringe; such a broad construction necessarily includes "a self-locking motor drive with a clutch" or a "non-self-locking [motor] drive with a brake." In short, the Court finds that the disclosed "adjusting means" structure is simply "a motor drive" and equivalents thereof.

**2. "Programmable Control Means" or "Control Means"**

As with the previous term, the function of "programmable control means" is not disputed. The function is: controlling the adjusting means. More specifically, under the Court's construction of adjusting means, the function is: controlling a motor drive or the equivalents thereof. Thus, the core dispute on the construction of "control means" is whether the specification adequately discloses a structure for controlling said motor drive. Carefusion contends the term is indefinite with no structure disclosed in the specification. Ergo, however, asserts that the structure is: "any programmable computer or programmable control device suitable for use in a multichannel infusion system and equivalents thereof." (Ergo Response Brief (Docket # 151) at 20.)

The term "programmable computer" does not appear in the specification. The term "programmable control device" does appear in the section of the specification describing the background of the invention:

> The flow-adjusting means are connected to a central, programmable control device, which is located in the lower part of the chassis, and which permits the selective actuation of the individual flow-adjusting means. The control device has a means for storing information, in which data fields on discharge schedules of the individual types of fluids are stored.

('412 Patent at 1:27-33.) However, as Ergo itself admits, this description pertains to the prior art contained in the European Patent application EP-B 302,752. (See Ergo Response Brief (Docket # 151) at 15.) Notably, the specification does reference a "control device" that has the means for "storing information" and "programming" but this device is not further described and is depicted in a "black box" fashion in Figure 1. ('412 Patent at 5:44-48.)

The Court fails to see how specification of the '412 Patent adequately discloses the structure proposed by Ergo. Therefore, the Court construes "programmable control means" to be an indefinite term. Ultimately, this conclusion is in line with <u>Biomedino LLC v. Waters Tech. Corp.</u>, 490 F.3d 946 (Fed. Cir. 2007), in which the term "control means" was similarly declared indefinite based on a finding that no structure had been disclosed for the claimed "control means." <u>Id.</u> at 952-53; <u>see also</u> <u>Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.</u>, 521 F.3d 1328, 1337-38 (Fed. Cir. 2008) (affirming the finding the term "game control means" was indefinite based on the lack of a disclosed structure in the patent).

### 3. "Data Input Means"

Both sides agree that the function of the data input means is the input of data. Likewise, both sides urge the Court to look towards the following portion of the specification for the corresponding structure:

> The data input circuit may be designed in the form of discrete keys, with which command information can be entered into the control device. To enter analog variables, e.g., the metering rate, it is advantageous to provide a continuously variable adjusting member with an acknowledge key, e.g. a turning knob with an angle transmitted and a push contact as an acknowledge key.

('412 Patent at 2:55-61.) Ergo contends this structural recitation means that the structure is: keys, or keys and a knob, and equivalents thereof. Carefusion argues that the structure is more limited to: discrete keys and a continuously variable adjusting member (i.e., a knob) with an acknowledge key.

Review of the figures and preferred embodiment in the patent reveals multiple references to an "analog adjusting member with integrated acknowledge key" (labeled number 23). (E.g., '412 Patent 5:54-61 & 6:50-68.) Thus, the Court concludes that one skilled in the art would find the corresponding structure to include both discrete keys and a continuously variable adjusting member (i.e., knob) with an acknowledge key. Based on this conclusion, the Court construes "data input means" to be limited to: discrete keys and a continuously variable adjusting member (i.e., a knob) with an acknowledge key, as well as equivalents thereof.

### 4. "Flow Measuring Means"

Similar to programmable control means, the dispute regarding construction of "flow measuring means" is whether there is adequate disclosure of a structure or whether the term

should be construed as indefinite. The undisputed function of the "flow measuring means" is clearly laid out in Claim 10: to "determin[e] fluid flow being metered into said discharge lines." ('412 Patent 9:11-12.) Ergo's proposed structure for this function is: screw rotation counters, drip counters and equivalents thereof. The problems with this proposed structure, as Carefusion points out, is that it appears nowhere in the specification.

Ergo nonetheless argues that one skilled in the art would implicitly understand reading Claim 10 that flow measuring means refers to screw rotation counters or drip counters. This assertion, Ergo contends, is supported by the deposition testimony of Dr. Daniel Raemer, Ergo's expert. In fact, Dr. Raemer testified at his deposition that the '412 Patent disclosed no structure for the flow measuring means. (See Raemer Dep. (Docket # 137-9) at 105 & 109.) Nonetheless, as a person skilled in the art, Raemer indicated that measuring of the fluid flow could be accomplished by the screw mechanism that is part of the syringe pump driver or by drip counters. (See id. at 108-109.) Having considered the Raemer testimony, the Court nonetheless concludes that this testimony "cannot supplant the total absence of structure from the specification." Biomedino, 490 F.3d at 950 (quoting Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1302 (Fed. Cir. 2005)). The fact that Dr. Raemer indicated that he and others skilled in the art "would be capable of implementing a structure" that would measure the fluid flow being metered into the discharge line does not excuse the fact that no structure is disclosed in the specification. Biomedino, 490 F.3d at 953. Thus, the Court finds no corresponding structure disclosed for "flow measuring means" and, therefore, construes "flow measuring means" as indefinite.

## III. CONCLUSION

The First Round Claims Construction is now complete. To summarize, "set" is construed as "one or more;" "adjusting means" is construed to cover a motor drive and equivalents thereof; and "data input means" is construed to cover discrete keys and a continuously variable adjusting member (i.e., a knob) with an acknowledge key, as well as equivalents thereof. Both "programmable control means" and "flow measuring means" are construed as indefinite in accordance with 35 U.S.C. § 112 ¶ 6.

Pursuant to the Court's prior orders, the parties shall file motions for summary judgment within fourteen days. (See Report of Hearing & Order (Docket # 124) at 2.) Alternatively, within fourteen days, the parties shall file any proposed amendment to the current scheduling order.[6] These next filings shall also indicate whether the parties believe it is appropriate for the Court to now rule upon any or all of the pending Daubert motions (Docket #s 133, 142, 144 & 187) or whether the parties anticipate the Court ruling on any of these motions in connection with any to-be-filed motions for summary judgment.

SO ORDERED.

      /s/ George Z. Singal
   United States District Judge

Dated this 28th day of December, 2010.

---

[6] While a joint proposal is encouraged, if parties file individual proposals, the Court will accept and consider any objections filed within seven days of the proposal.